1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT
9                          EASTERN DISTRICT OF CALIFORNIA

10
11   MARTIN GALVAN GOMEZ,              )      1:04-CV-06282 AWI NEW (DLB) HC
                                       )
             Petitioner,               )
12                                     )
                                       )      FINDINGS AND RECOMMENDATION
       v.                              )      REGARDING PETITION FOR WRIT OF
13                                     )      HABEAS CORPUS
                                       )
14   STUART J. RYAN,                   )
                                       )
15             Respondent.             )
                                       )
16   _____)

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                                    **BACKGROUND**

20          Petitioner is currently in the custody of the California Department of Corrections pursuant to

21   a judgment of the Superior Court of California, County of Tulare, following his conviction by jury

22   trial of one count of first degree murder in violation of Cal. Penal Code § 187, and one count of

23   conspiracy to commit first degree murder in violation of Cal. Penal Code § 182(a)(1). See Lodged

24   Doc. No. 4. In addition, Petitioner was found guilty of the enhancement charged for personally using

25   and discharging a firearm during commission of a felony causing great bodily injury or death in

26   violation of Cal. Penal Code §§ 12022(a)(1), 12022.53(d). Id. On October 25, 2001, Petitioner was

27   sentenced to serve an indeterminate term of twenty-five years to life on the count of first degree

28   murder, plus twenty-five years to life for the firearm use enhancement. Id. Petitioner was further

1   sentenced to twenty-five years to life on the conspiracy conviction with the sentence to run

2   concurrently. Id.

3       Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

4   (hereinafter "5th DCA"). On August 12, 2003, the 5th DCA struck the sentence on the conspiracy

5   conviction and awarded an additional day of credit because of sentencing miscalculations. Id. The

6   judgment was affirmed in all other respects. Id.

7       On September 8, 2003, Petitioner filed a petition for review in the California Supreme Court.

8   See Exhibit 5, Answer. The petition was summarily denied on October 22, 2003. See Exhibit 6,

9   Answer.

10      On September 20, 2004, the Court received the instant petition which Petitioner had filed in

11  the United States District Court for the Central District of California, following an order of transfer

12  to this division.  The petition presents the following eight (8) grounds for relief: (1) "The conspiracy

13  conviction violates due process, because it is not supported by substantial evidence"; (2) "The

14  [instructions eliminated] any meaningful distinction between express malice and premeditation"; (3)

15  "Admitting evidence of an un-prosecuted attempted stabbing violated due process"; (4) "Curtailing

16  Dr. LaCalle's testimony violated the Fifth, Sixth, and Fourteenth Amendments"; (5) "Judicial

17  misconduct and improper invocation of appellate waiver principles violated due process"; (6)

18  "CALJIC No. 17.41.1 violates the constitutional rights to jury trial and due process"; (7) "Applying

19  section 12022.53 to a first degree murder conviction violates the rule against enhancing an offense

20  with an essential element"; and (8) "The custodial interrogation of Petitioner required procedural

21  safeguards of Miranda."

22      Respondent filed an answer to the petition on March 2, 2005. Respondent concedes the

23  petition is exhausted with the exception of Ground Eight which he contends is moot. As to the

24  remaining claims, Respondent contends they are without merit. On March 17, 2005, Petitioner filed a

25  traverse.

26                              **FACTUAL BACKGROUND**

27      The Court hereby adopts the factual summary of the case as set forth by the 5th DCA in its

28  opinion of August 12, 2003:

Petitioners Martin Galvan Gomez and Vicente Gomez were surprised to see Daniel Delgado when they arrived at Catalina Ponce's birthday party. Delgado was portrayed as Martin's longtime nemesis dating back to Martin's childhood in Mexico. Martin reacted violently, shooting and killing Delgado. . . .

The dispute at trial was not what occurred at the party but Martin's motivation and Vicente's involvement. Martin and Vicente arrived at the party after Delgado. Shortly after arriving, Martin walked up to Delgado and shot him four or five times. Delgado died before he reached the hospital.

Martin claimed he acted in self-defense or, at most, out of an objectively unreasonable belief that he needed to defend himself (imperfect self-defense). While there was no evidence that Delgado did anything to threaten Martin at the party, Martin based his defense on evidence about his family history.

Delgado was Martin and Vicente's cousin. While Delgado was older than Martin and Vicente, they grew up in the same isolated, rural part of Mexico in the state of Michoacan. Delgado and Martin's father, Santiago, had a dispute approximately 25 years ago in Michoacan. Santiago was intoxicated one day when he challenged Delgado to a "quick draw" contest that was not intended to result in injury to either party. Santiago accidentally shot Delgado, grazing him in the head but causing no significant injury. In response, Delgado shot Santiago at least three times, once in the arm, disarming him, and then in both legs.

Santiago recovered from this incident but was killed approximately 20 years later. Although Delgado did not kill Santiago, Martin and his family believed Delgado ordered another to do so. A few years later, Martin's brother was killed. Again, while Delgado did not kill his brother, Martin and his family believed that Delgado ordered another to kill him.[1]

Based on this history, Martin argued that he believed Delgado was at the party to kill him, as he had done to his father and brother. Martin claimed he acted to save his life.

Vicente argued that while he arrived at the party with Martin, he did not know that Delgado was going to be there and did not participate in the shooting in any matter.

See Lodged Doc. No. 4 at pp. 2-3, Answer.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly,

---

[1]Neither Martin nor Vicente testified at trial. Martin was able to introduce this evidence through other witnesses familiar with these beliefs.

1   the Court has jurisdiction over the action.

2       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

3   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

4   Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

5   F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

6   *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

7   (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

8   filed after the enactment of the AEDPA; thus, it is governed by its provisions.

9   **II.  Legal Standard of Review**

10      This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

11  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

12  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

13      The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

14  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

15  (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

16  adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

17  application of, clearly established Federal law, as determined by the Supreme Court of the United

18  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

19  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

20  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

21      As a threshold matter, this Court must "first decide what constitutes 'clearly established

22  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

23  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

24  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

25  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

26  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

27  the Supreme Court at the time the state court renders its decision." Id.

28      Finally, this Court must consider whether the state court's decision was "contrary to, or

1    involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72,

2    *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

3    writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

4    question of law or if the state court decides a case differently than [the] Court has on a set of

5    materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72.

6    "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

7    court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

8    applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

9        "[A] federal court may not issue the writ simply because the court concludes in its

10   independent judgment that the relevant state court decision applied clearly established federal law

11   erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.  A

12   federal habeas court making the "unreasonable application" inquiry should ask whether the state

13   court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at 409.

14        Petitioner has the burden of establishing that the decision of the state court is contrary to or

15   involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

16   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

17   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

18   decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

19   Cir.1999).

20        AEDPA requires that we give considerable deference to state court decisions. The state

21   court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

22   interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

23   U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

24   **III.  Review of Petitioner's Claims**

25        **A. Ground One**

26        In his first ground for relief, Petitioner claims the evidence was insufficient to support the

27   criminal conspiracy conviction. He claims there was no evidence of an agreement or an overt act in

28   furtherance of an unlawful agreement. Therefore, he asserts the conspiracy conviction must be

1  overturned.

2       In reviewing sufficiency of evidence claims, California courts expressly follow the <u>Jackson</u>

3  standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  <u>See</u> <u>People v. Johnson</u>, 26 Cal.3d

4  557, 575-578 (1980); <u>see also</u> <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992).  Pursuant to the

5  Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly

6  supported by the record is as follows:

7       "[W]hether, after viewing the evidence in the light most favorable to the
         prosecution, any rational trier of fact could have found the essential elements
8        of the crime beyond a reasonable doubt."

9  <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).

10      Sufficiency claims are judged by the elements defined by state law.  <u>Jackson</u>, 443 U.S. at 324

11  n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

12  § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of correctness

13  applies to state appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v.</u>

14  <u>Borg</u>, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

15  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

16  the state court underlying those determinations are entitled to the presumption.  <u>Sumner v. Mata</u>, 455

17  U.S. 539, 597 (1981).

18      This claim was first presented on direct appeal to the 5th DCA.  On August 12, 2003, the 5th

19  DCA denied the claim in a reasoned opinion.  <u>See</u> Lodged Doc. No. 4.  On September 8, 2003,

20  Petitioner filed a petition for review in the California Supreme Court. <u>See</u> Lodged Doc. No. 5. The

21  petition was summarily denied on October 22, 2003, without comment or citation of authority. <u>See</u>

22  Lodged Doc. No. 6. The California Supreme Court, by its "silent order" denying review of the 5th

23  DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the

24  opinion of the 5th DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

25      In rejecting this claim, the 5th DCA first properly set forth the <u>Jackson</u> standard:

26      Our review of the sufficiency of the evidence is deferential. We 'review the whole
         record in the light most favorable to the judgment below to determine whether it discloses
27      substantial evidence – that is, evidence which is reasonable, credible, and of solid value –
         such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.
28      We focus on the whole record, not isolated bits of evidence. We presume the existence of

1  every fact the trier of fact reasonably could deduce from the evidence that supports the
2  judgment. We will not substitute our evaluations of a witness's credibility for that of the trier
   of fact.

3  See Lodged Doc. No. 4 at 4-5 (citations omitted).

4       The appellate court reviewed the state of the evidence and determined there was sufficient
5  evidence to support the conspiracy conviction. First, the court noted that two witnesses, Albert
6  Barron and Santos Cruz Garcia, testified to seeing Petitioner and Vicente approach the party from an
7  alleyway. Id., at 5. The witnesses saw the two stop short of the yard and speak to each other. Id. They
8  testified they then saw Vicente hand a small unknown object to Petitioner who then placed the object
9  into the waistband of his pants. Id. Vicente and Petitioner then walked up to the witnesses and the
10  victim. Id., at 6. Vicente greeted Delgado and then stepped to the side whereupon Petitioner pulled a
11  gun from his waistband and shot Delgado. Id.

12       Another witness, Javier Nunez, testified he saw Vicente grab Petitioner to leave after
13  Petitioner had shot Delgado. Id. Nunez saw bullets or something similar fall from Vicente's hands as
14  they were leaving. Id. Vicente picked up the objects and gave them to Petitioner. Id. In addition,
15  evidence was presented that Vicente later made a statement that "he who owes will pay" and that he
16  hoped Delgado would die. Id.

17       Based on this evidence, the appellate court found there was substantial evidence supporting
18  the prosecution's theory that an agreement existed between Vicente and Petitioner to murder
19  Delgado. It was reasonable to infer that Petitioner and Vicente stopped to converse outside the yard
20  upon seeing Delgado. It was also reasonable to infer that the object handed to Petitioner which he
21  then placed in his waistband was the gun Petitioner used to kill Delgado, since a witness testified he
22  saw Petitioner shortly thereafter pull out a gun from that same area and shoot Delgado. It is also
23  reasonable to infer that the plan was for Vicente to greet Delgado and distract him while Petitioner
24  stood behind him. At that point, Vicente stepped aside as planned and Petitioner pulled out his
25  weapon and shot him. Based on the evidence, the appellate court's decision was reasonable.

26       Petitioner further argues that a conspiracy was not proven because there was no evidence of
27  an overt act committed in furtherance of the conspiracy. According to California law, a conviction
28  for conspiracy requires proof of four elements: "(1) an agreement between two or more people, (2)

who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." People v. Vue, 143 Cal.App.4th 1009, 1024 (2006), *citing* Cal. Pen.Code, §§ 182, subd. (b), 184; People v. Morante, 20 Cal.4th 403, 416 (1999); 1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Elements, § 68, p. 277. The information charged Petitioner and Vicente with six overt acts: 1) Obtaining a gun; 2) Obtaining bullets; 3) Loading the gun; 4) Transporting the gun; 5) Handing the gun to the shooter; and 6) Aiming the gun at the victim. CT[2] 60. The appellate court found that substantial evidence supported overt acts five and six.[3] The appellate court's finding was not unreasonable. The jury reasonably inferred that the object Vicente handed Petitioner was the gun he then used to shoot the victim. In addition, the act of aiming the weapon at the victim qualified as an overt act. People v. Jurado, 38 Cal.4th 72, 121 (2006) ("Commission of the target offense in furtherance of the conspiracy satisfies the overt act requirement"), *citing* People v. Padilla, 11 Cal.4th 891, 966 (1995), *overruled on other grounds,* People v. Hill, 17 Cal.4th 800 (1998).

As stated above, the appellate court applied correct controlling Supreme Court authority. And in light of the evidence presented at trial, this Court cannot say the appellate court's rejection of the claim was unreasonable. The claim must be rejected.

**B. Ground Two**

In his next claim, Petitioner asserts jury instructions and the prosecutor misled jurors by eliminating any meaningful distinction between premeditation and express malice. He argues the instructions allowed the jurors to find Petitioner guilty based on an incorrect theory of "split second" premeditation.

The jury was instructed with the standard California instruction on deliberate and premeditated murder as follows:

> All murder which is perpetrated by any kind of willfull [sic], deliberate and

---

[2]"CT" refers to the Clerk's Transcript on Appeal which has been lodged with the Court.

[3]The appellate court determined that acts one through four could not constitute overt acts since they occurred before an agreement had been reached between the conspirators. See Lodged Doc. No. 4 at 8.

premeditated killing with express malice aforethought is murder in the first degree.

The word "willfull," [sic] as used in this instruction, means intentional.

The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word "premeditated" means considered beforehand.

If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill.

CT 283-284; CALJIC No. 8.20.

The jury was also instructed on express malice as follows:

"Malice" may be either express or implied.

Malice is express when there is manifested an intention unlawfully to kill a human being.

Malice is implied when:
1. The killing resulted from an intentional act,
2. The natural consequences of the act are dangerous to human life, and
3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

The word "aforethought" does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act.

CT 282; CALJIC No. 8.11.

At the request of the prosecution, the trial court also instructed the jury with the following

statement:

> To prove the killing was "deliberate and premeditated", it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act.

CT 285.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), citing Henderson v. Kibbe,  431 U.S. 145, 154 (1977).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  A jury instruction is constitutionally sound if it creates a permissive inference that allows, but does not require, the jury to infer an essential fact from proof of another fact so long as "the inferred fact is more likely than not to flow from the proved fact on which it is made to depend." Schwendeman v. Wallenstein, 971 F.2d 313, 316 (9th Cir.1992) (citations and internal quotations omitted), cert. denied, 113 S.Ct. 975 (1993).

This claim was also first presented and denied on direct appeal to the 5th DCA. In rejecting this claim, the appellate court noted that the prosecution's requested instruction was a direct quote of the fourth paragraph of Cal. Penal Code § 189 and was therefore an accurate statement of California law. See Lodged Doc. No. 4 at 10. Second, this addition was approved in People v. Smithey, 20 Cal.4th 936, 981 (1999).

The appellate court further determined that the jury could not possibly have been confused. While CALJIC No. 8.11 defined express malice as "an intention unlawfully to kill a human being," CALJIC No. 8.20 defined premeditation as "considered beforehand." CT 282-283. CALJIC No. 8.20

1   further instructed that to constitute first degree murder, the defendant's intent to kill must be the

2   "result of deliberation and premeditation." CT 283. The jury was told that the decision to kill could

3   be arrived at in a short period of time; however, a mere unconsidered and rash impulse would not

4   qualify as deliberate and premeditated. CT 283-284. Finally, the instruction concluded that "[t]o

5   constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of

6   killing and the reasons for and against such a choice and, having in mind the consequences, he

7   decides to and does kill." CT 284.

8        The appellate court determined that the combined effect of the instructions was to instruct the

9   jury that the "slayer must weigh and consider the question of killing but is not required to reflect

10  maturely and meaningfully on the gravity of his act." See Lodged Doc. No. 4 at 11. The court

11  concluded the instructions were correct statements of law and there was "virtually no possibility the

12  jury was confused." Id. As Petitioner has failed to demonstrate constitutional error in the jury charge,

13  the Court cannot say the appellate court's decision was unreasonable. In addition, he has failed to

14  demonstrate any prejudice. "Malice aforethought was simply not an issue in this case." Id. Thus,

15  Petitioner has failed to show the instructions had a substantial and injurious effect on the verdict.

16  The claim should be denied.

17        **C. Ground Three**

18        Petitioner next argues his due process rights were violated when the trial court admitted

19  evidence of prior bad acts. Specifically, Alberto Barron, a friend of the victim and a witness to the

20  incident, testified that he was afraid of Petitioner because Petitioner had attempted to stab him with a

21  knife on a prior occasion. RT[4] 370-371.  Petitioner claims the evidence was more prejudicial than

22  probative and should not have been admitted.

23        In a federal habeas action, review is limited to whether the petitioner's conviction violated

24  constitutional standards. Engle v. Isaac, 456 U.S. 107, 119 (1982). Generally, the admissibility of

25  evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.

26  Estelle, 502 U.S. 62 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478

27

28

---

[4]"RT" refers to the Reporter's Transcript on Appeal which has been lodged with the Court.

U.S. 1021 (1985).  Nevertheless, with respect to the admission of prejudicial evidence, habeas relief is available if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. 62; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'"  Id. at 920, *quoting* Kealohapaoule v. Shimoda, 800 F.2d 1463, 1465 (9th Cir.1986).

This claim was also first presented on direct appeal to the 5th DCA, and the 5th DCA denied the claim in a reasoned opinion. In addressing Petitioner's claim, the appellate court summarized the California evidentiary standards with respect to the exclusion of evidence as set forth in Cal. Evidence Code § 352. The court determined the trial court did not abuse its discretion in admitting the evidence of Petitioner's prior bad act of attempting to stab Barron because "the evidence was highly relevant to explain why Barron initially lied [to police]." See Lodged Doc. No. 4 at 19. In addition, the court found the evidence "did not create a substantial danger that it would cause *undue* prejudice." Id.

The appellate court's determination is not unreasonable. As previously discussed, Alberto Barron was standing with victim Delgado when Delgado was shot. He observed Petitioner and Vicente stop and converse in the yard, he watched as Vicente handed Petitioner an object which he then concealed in his waistband, and he watched as they approached the group. He also saw Vicente then greet Delgado and then step out of the way so Petitioner could shoot Delgado. Initially, Barron lied to the police and denied any knowledge of the shooting. However, he later provided a statement which was consistent with his trial testimony. The defense attacked Barron's credibility with the fact he had initially lied. The prosecution then attempted to rehabilitate him by introducing the evidence of the prior stabbing attempt to show why Barron initially lied. The evidence was thus admitted for the permissible inference to be drawn of Barron's state of mind. Indeed, the trial court immediately

1  instructed the jury that the alleged stabbing incident could only be considered for the limited purpose

2  of evaluating Barron's state of mind.

3       In addition, as reasonably found by the appellate court, the evidence was not unduly

4  prejudicial. Barron and other witnesses had testified that they viewed Petitioner actually shoot the

5  victim four to five times, so an attempted stabbing incident that was never reported to police and

6  testified to by a witness who had admittedly lied to police would have had a negligible effect when

7  compared to the shooting itself.

8       Accordingly, the rejection of this claim by the state courts was neither contrary to or an

9  unreasonable application of clearly established Federal law, nor an unreasonable determination of the

10 facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

11      **D. Ground Four**

12      In his fourth claim, Petitioner argues the trial court erred by curtailing the testimony of a

13 defense expert. Specifically, defense counsel in opening statement told the jury they would hear

14 evidence from an expert, Dr. Jose LaCalle, on Petitioner's motivation and reasons for killing

15 Delgado. Petitioner maintains Dr. LaCalle would have testified that Petitioner's actions were in self-

16 defense and that Petitioner subjectively believed he needed to resort to deadly force in self-defense.

17 However, the evidence was not fully presented through Dr. LaCalle because the trial court ruled to

18 exclude the proposed testimony as hearsay. In effect, Petitioner argues, his defense theory of

19 imperfect self-defense was gutted in violation of his constitutional right to present a complete and

20 effective defense.

21      The Supreme Court has held that expert testimony can be excluded based on judicial

22 determination of reliability. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589

23 (1993). This "gatekeeping" obligation applies to all expert testimony. Kumho Tire Co., Ltd. v.

24 Carmichael, 526 U.S. 137, 141, 147-48 (1999).  In addition, "the trial judge has broad discretion in

25 the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless

26 manifestly erroneous." Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962), *citing* Congress and Empire

27 Spring Co. v. Edgar, 99 U.S. 645, 658 (1878).  Further, "expert testimony not only is unnecessary

28 but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can

1    be accurately and intelligibly described to the jury, and if they, as men of common understanding, are

2    as capable of comprehending the primary facts and of drawing correct conclusions from them as are

3    witnesses possessed of special or peculiar training, experience, or observation in respect of the

4    subject under investigation.'" Salem, 370 U.S. at 35, *quoting* United States Smelting Co. v. Parry,

5    166 F. 407, 411, 415 (8th Cir.1909).

6         On direct appeal, the 5th DCA reviewed the trial court's ruling which excluded certain

7    testimony by Dr. LaCalle. Petitioner sought to elicit from Dr. LaCalle that "(1) [Petitioner] had been

8    teased mercilessly by Delgado; (2) Delgado had given [Petitioner] the nickname 'becerra,'

9    apparently a degrading term [in Spanish] that means female calf; (3) [Petitioner] fled Mexico to get

10   away from Delgado; (4) Delgado accused [Petitioner] of being a coward; (5) people from Michoacan

11   generally carry guns when attending parties; (6) Petitioner didn't know Delgado would be at the

12   party; and (7) Petitioner had been drinking prior to the party." See Lodged Doc. No. 4 at 12.

13   Petitioner argued that Dr. LaCalle should have been allowed to testify to these statements, despite

14   their hearsay nature, because under California law an expert is permitted to testify to the basis for his

15   opinions. See Cal. Evidence Code §§ 801, 802.

16        The appellate court found no abuse of discretion on the part of the trial court. First, there was

17   no evidence in the record that showed Dr. LaCalle based his opinions on this information. Instead,

18   the doctor's opinions were limited to Petitioner's level of intelligence and how this factor affected

19   his perceptions. RT 974. Under California evidentiary standards, the statements were therefore

20   inadmissible.

21        Second, Petitioner's defense counsel had refused to permit any discovery of the doctor's

22   notes. Therefore, Dr. LaCalle was precluded from testifying to any information he had learned from

23   Petitioner due to Petitioner's assertion of attorney-client privilege.

24        Third, the appellate court noted that trial courts have considerable discretion in excluding the

25   hearsay basis of an expert's opinion. This is to prevent a defendant from "testifying through an

26   expert without ever taking the stand and being subjected to cross-examination," which is exactly

27   what Petitioner was attempting to do in this case. See Lodged Doc. No. 4 at 14.

28        In light of the facts above, the appellate court's rejection of Petitioner's claim was

1   reasonable. As discussed by the appellate court, the evidence Petitioner sought to elicit through Dr.

2   LaCalle at trial was inadmissible hearsay. The record reveals that Dr. LaCalle's opinions were not

3   based on these statements at all, but on Petitioner's level of intelligence. RT 974. In addition, as

4   pointed out by Respondent "the substance of the excluded testimony had been presented to the jury

5   through other witnesses." See Answer at 15. Witness Catalina Ponce testified to the long-running

6   feud between Petitioner's family and Delgado's family. RT 574-604. She testified to Delgado calling

7   Petitioner by the nickname "becerra." RT 575. She testified to the reputed killing of Petitioner's

8   father by Delgado's brother-in-law. RT 580-584, 599-604, 609-610. The excluded portions of Dr.

9   LaCalle's testimony were therefore cumulative and unnecessary. Salem, 370 U.S. at 35.

10      Thus, the state court denial of this claim was neither contrary to or an unreasonable

11   application of clearly established Federal law, nor an unreasonable determination of the facts in light

12   of the evidence presented. See 28 U.S.C. § 2254(d). It should be denied.

13      **E. Ground Five**

14      In his next claim for relief, Petitioner argues the trial court committed misconduct in the

15   following ways: 1) By failing to rule on defense counsel's motion to strike; 2) By belittling defense

16   counsel in front of the jury; 3) By instructing the jury that Dr. LaCalle's expertise was limited to

17   psychology and did not extend into criminal procedure; and 4) By briefly leaving the bench during

18   Dr. LaCalle's testimony. Respondent argues the claim is procedurally defaulted and meritless.

19      When a district court reviews a state court judge's behavior on federal habeas review, the

20   question is "whether the state trial judge's behavior rendered the trial so fundamentally unfair as to

21   violate federal due process under the United States Constitution." Duckett v. Godinez, 67 F.3d 734,

22   740 (9th Cir.1995), citing Gayle v. Scully, 779 F.2d 802, 806 (2d Cir.1985), cert. denied, 479 U.S.

23   838 (1986). Further, to succeed on a judicial bias claim, Petitioner must "overcome a presumption of

24   honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975). A

25   judge's remarks or opinions will not demonstrate bias unless they "reveal such a high degree of

26   favoritism or antagonism as to make fair judgment impossible." Liteky v. United States, 510 U.S.

27   540, 555 (1994).

28      The 5th DCA first determined the issue had been waived because Petitioner failed to object to

1  the stated instances of misconduct at trial. Respondent correctly argues the claim is therefore

2  procedurally defaulted. <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir.2002).

3       The court then determined that, despite the fact the issue had been waived, there was no

4  error. First, the court addressed the claim that the trial court failed to rule on defense counsel's

5  motion to strike during Catalina Ponce's testimony. At the conclusion of redirect examination, the

6  prosecutor asked an argumentative question and defense counsel objected. The witness did not

7  answer the question. The trial court sustained the objection whereupon defense counsel moved to

8  strike. The court did not rule on the motion and continued with the trial. As discussed by the

9  appellate court, there was no error in this because the witness had not answered the question and thus

10 there was no testimony to strike. A question itself is not evidence. <u>See</u> CALJIC No. 1.02; Cal.

11 Evidence Code § 353. Consequently, "the motion to strike was superfluous and did not require a

12 ruling." <u>See</u> Lodged Doc. No. 4 at 21.

13      Petitioner next claims the trial judge belittled defense counsel and created the appearance of

14 bias by the judge toward the prosecution. During the examination of witness Barron, defense counsel

15 raised an objection on the dual grounds of hearsay and relevance. The trial court sustained the

16 objection. Petitioner then again asserted the relevancy objection. The trial court responded, "It's

17 sustained. I can't - - I can't give you bonus points, it's sustained." RT 344-345. The appellate court

18 determined the trial judge was merely conveying, albeit in a jocular manner, the fact that the

19 objection had already been sustained and the second objection served no purpose. As reasonably

20 found by the appellate court, this is "not the type of disparaging remark that ever could support a

21 claim of judicial misconduct." <u>See</u> Lodged Doc. No. 4 at 21.

22      In the third alleged instance of misconduct, the trial court instructed the jury that Dr.

23 LaCalle's expertise did not include criminal procedure. During the prosecutor's cross-examination of

24 Dr. LaCalle, the prosecutor questioned Dr. LaCalle about the results of an I.Q. test he had

25 administered to Petitioner. He asked whether Dr. LaCalle had verified the test results with another

26 psychologist, as follows:

27      [PROSECUTOR]: Did you have this I.Q. test that you administered verified by another
     psychologist?

28

1    [DR. LACALLE]: No I didn't.

2    [PROSECUTOR]: Is that something that could be done within your field?

3    [DR. LACALLE]: It could be done. You could have done it, too.

4    RT 975.

5    Subsequently, the trial court interrupted the prosecutor as follows:

6    THE COURT: Excuse me - - never mind, go ahead.

7    [PROSECUTOR]: I guess I could have made the motion to strike, but - -

8    THE COURT: Yes. The - - the 'you could have done it, too,' is stricken. The jury will
     disregard that.

9    [DR. LACALLE]: Sorry, your Honor.

10   RT 976.

11   The same issue came up again during redirect examination:

12   [DEFENSE COUNSEL]: Now, Doctor, it's not a routine practice to have another
13   psychologist verify a colleague's analysis, is it?

14   [DR. LACALLE]: No. Usually, that is done - - and that's why I apologize to the court for my
     - - my remark, that if somebody is not in agreement with my findings, that person, be a judge
15   or be a attorney, is the person that will ask another psychologist to - - to retest or to examine
     my - - my test.

16   [PROSECUTOR]: Your Honor, I have to object, move to strike.

17   THE COURT: The answer is stricken.

18   RT 984.

19   Following a brief sidebar, the trial court admonished the jury as follows:

20   THE COURT: Ladies and gentlemen, as to the last answer, you shall totally disregard it.
21   With all due respect to the doctor, he is not an expert in what is permissible procedurally in a
     criminal case. He has been offered as an expert in the realm of psychology, and his expertise
22   is limited to that.

23   RT 987.

24   Petitioner argues the judge's actions constituted misconduct because they disparaged the

25   defense. There is no merit to this claim. As properly found by the appellate court, "[t]hese comments

26   were not disparaging, do not indicate judicial bias and do not constitute misconduct . . . . It was the

27   trial court's duty to ensure that the jury understood the limitations on the People's ability to examine

28   [Petitioner], without offending Petitioner's right not to testify." See Lodged Doc. No. 4 at 23.

1    Finally, Petitioner claims the trial judge committed misconduct when he left the bench

2    momentarily. This occurred during the cross-examination of Dr. LaCalle. The prosecutor had asked

3    Dr. LaCalle about the various occasions that he had testified for the defense. RT 980. Dr. LaCalle

4    responded by saying he would have to go through his records. RT 980. At this point, the trial judge

5    left the bench for a moment to obtain a book. He explained during the motion for new trial that he

6    understood the witness would need a few minutes to look through his records and so he took the

7    opportunity of the interruption in proceedings to step out of the courtroom. See Lodged Doc. No. 4 at

8    24. At this point, the prosecutor asked the witness to "hold off on the rest of [his] answer." RT 980.

9    When the judge returned, the prosecutor asked the witness to resume his answer. RT 980.

10    The appellate court found the trial judge should have called a short recess rather than

11    unexplainedly leave the courtroom, even for the brief amount of time he was away. Nevertheless, the

12    appellate court determined there was no prejudice. "No questions were presented and no answers

13    given during the trial judge's absence." See Lodged Doc. No. 4 at 24; RT 980. The appellate court's

14    determination was not unreasonable. The trial court's absence, while improper, did not render the

15    trial so fundamentally unfair as to violate federal due process.

16    Accordingly, the claim should be rejected.

17    **F. Ground Six**

18    In his next ground for relief, Petitioner claims the instruction, CALJIC 17.41.1, violated his

19    right to jury trial by undermining the fair functioning of the jury trial process.

20    CALJIC 17.41.1, as given by the trial court, provides:

21    The integrity of a trial requires that jurors, at all times during their deliberations,
      conduct themselves as required by these instructions. Accordingly, should it occur that any

22    juror refuses to deliberate or expresses an intention to disregard the law or to decide the case
      based on penalty or punishment, or any other improper basis, it is the obligation of the other

23    jurors to immediately advise the Court of the situation.

24    CT 323.

25    As previously stated, to obtain federal collateral relief for errors in the jury charge, a

26    petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting

27    conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Even if it is determined

28    that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if

the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

In rejecting this claim, the 5th DCA stated:

> The [California] Supreme Court held in *People v. Engleman* (2002) 28 Cal.4th 436, 449 that CALJIC No. 17.41.1 did not violate the United States or California Constitutions. Even if we disagreed with the Supreme Court, which we do not, we are bound by its holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

See Lodged Doc. No. 4 at 25.

In this case, there is nothing in the record to support Petitioner's claim. There were no reports

of jurors refusing to deliberate or disregarding the law. A jury deadlock did not occur, and there were

no holdout jurors. In short, there is no reason to believe the court's use of CALJIC 17.41.1 played

any role in the jury's deliberations. There is no evidence that deliberations were improperly chilled,

that majority jurors improperly imposed their will on the minority, or that Petitioner was denied his

right to a unanimous jury and fair trial. Therefore, Petitioner has failed to demonstrate any prejudice

resulting from this instruction.

Moreover, Petitioner has failed to establish a federal constitutional violation.  The Supreme

Court has not held this instruction to be unconstitutional, and Petitioner does not point to any

Supreme Court authority which would bar the giving of this instruction.  The claim is foreclosed by

Brewer v. Hall, 378 F.3d 952, 957 (9th Cir.2004), which affirmed a district court's denial of the same

claim because there is no clearly established federal law holding that CALJIC 17.41.1 violates an

existing constitutional right.

Accordingly, the rejection of this claim by the state courts was neither contrary to or an

unreasonable application of clearly established Federal law, nor an unreasonable determination of the

facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

### G. Ground Seven

In his seventh claim for relief, Petitioner contends the trial court wrongfully enhanced his

sentence with an essential element of the underlying offense. He argues his sentence of fifty years to

life is grossly disproportionate punishment in violation of the Constitution, and he argues the

enhancement violates his right to equal protection.

1    This issue was not raised before the trial court; therefore, the appellate court found the issue

2    had been waived. Respondent correctly argues the claim is thus procedurally defaulted. Melendez v.

3    Pliler, 288 F.3d 1120, 1125 (9ᵗʰ Cir.2002). In any case, there is no merit to Petitioner's claim.

4    *1. Cruel and Unusual Punishment*

5    A criminal sentence that is not proportionate to the crime for which a defendant is convicted

6    may indeed violate the Eighth Amendment.  In Lockyer v.  Andrade, 123 S. Ct.1166 (2003), the

7    Supreme Court recently discussed the current state of Eighth Amendment proportionality review and

8    held that the only clearly established governing legal principle is that a "gross disproportionality"

9    review applies to criminal sentences for a term of years.  Id. at 1173.  Citing extensively to its past

10   cases dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court

11   acknowledged that it has "not established a clear and consistent path for courts to follow."  Id.  The

12   Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or

13   'unreasonable application of' frame work is the gross disproportionality principle, the precise

14   contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  Id.[5]

15   In Ewing v.  California, 123 S. Ct.1179 (2003), the Supreme Court again reviewed the

16   Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view [6]

17   that:

18        [There are] four principles of proportionality review-- the primacy of the legislature;
          the variety of legitimate penological schemes; the nature of our federal system; and,
19        the requirement that proportionality be guided by objective factors– that inform the
          final one: The Eighth Amendment does not require strict proportionality between the
20        crime and the sentence.  Rather, it forbids only extreme sentences that are 'grossly
          disproportionate' to the crime.
21
     Ewing, at 1186-1187.
22
23   In this case, the appellate court properly applied governing Supreme Court precedent set forth

24   in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (concurring opinion of Kennedy, J.). The court

25        [5] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment.  See Solem
26   v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980).  However, Rummel and Solem analyze cruel
     and unusual punishment in the context of recidivist statutes.  In this case, Petitioner was sentenced solely on his current
27   conviction.

28        [6]As expressed in his concurring opinion in Harmelin v.  Michigan, 501 U.S. 957, 1001 (1991), *citing* Solem v.
     Helm, 463 U.S. 277, 288 (1983).

found the 25 year-to-life enhancement for personally discharging a firearm causing death was not so disproportionate as to rise to the level of a constitutional violation. The court determined that Petitioner's crime certainly deserved to be punished more severely than other crimes which had been similarly punished and held not to offend the Constitution. In light of the fact Petitioner is being punished for premeditated murder, this Court cannot say the appellate court's determination was unreasonable. The claim should be denied.

### 2. Equal Protection

Petitioner also alleges the enhancement violates his right to equal protection. He claims because the prosecutor can choose to charge a defendant with this enhancement or not, or could charge the defendant with a different enhancement, different defendants under similar circumstances could be treated unequally.

The Equal Protection Clause requires that persons who are similarly situated be treated alike. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985).  An equal protection claim may be established in two ways.   First, a petitioner establishes an equal protection claim by showing that he has been intentionally discriminated against on the basis of the his membership in a protected class. See, e.g., Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.2001). If the action in question does not involve a suspect classification, a petitioner may establish an equal protection claim by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose.  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); San Antonio School District v. Rodriguez, 411 U.S. 1 (1972); Squaw Valley Development Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir.2004); SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir. 2002). To state an equal protection claim under this theory, a petitioner must allege that:  (1) he is a member of an identifiable class; (2) he was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. Village of Willowbrook, 528 U.S. at 564.

In this case, Petitioner does not claim to have been discriminated against based on his membership in a protected class. Rather, he claims unequal treatment because he used a firearm rather than another deadly weapon such as a knife. This argument is without merit. As correctly

argued by Respondent, the distinction made by the legislature between firearm-wielding felons and other deadly weapon-wielding felons is rationally related to the inestimable public harm caused by the use of firearms. This case is illustrative. Petitioner fired his firearm four to five times at a birthday party. The great danger he posed to others as compared to the danger he would have posed had he used a knife is clear; therefore, it is understandable why the legislature would punish felons who use firearms more harshly than others.

### *3. Double Jeopardy*

Finally, Petitioner argues his sentences for the enhancement and the underlying murder conviction violate the Double Jeopardy clause because he is being punished twice for the same conduct.

"The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932). Under Blockburger, the legislature "is deemed to have intended multiple punishments if each offense require[s] proof of a fact that the other does not." United States v. Alerta, 96 F.3d 1230, 1238 (9th Cir.1996)

Here, the crime of murder and the sentencing enhancement require proof of different elements. The elements of murder do not include the use of a firearm. As discussed by the appellate court, murder can be accomplished in many different ways, including use of fists, feet, knives, rope, bombs, vehicles, and so forth. However, the method used is not an element. In addition, the enhancement does not require that the victim be killed. It is sufficient that the defendant only cause great bodily injury. Accordingly, the state court rejection of this claim was a consistent and reasonable application of governing Supreme Court authority. The claim should be denied.

### **H. Ground Eight**

In his final claim for relief, Petitioner contends that his custodial interrogation in Las Vegas several days after the death of Delgado required the protections set forth in Miranda v. Arizona, 384 U.S. 436 (1966). He requests that "all statements and evidence secured as a result of the unlawful, involuntary custodial interrogation that was carried out, must be excluded."

1   As pointed out by Respondent, this claim is entirely moot because Petitioner was successful

2   at trial in excluding his statements to officers. The trial court had granted Petitioner's motion to

3   exclude, stating, "I am not persuaded by the preponderance of the evidence that there was a knowing

4   and intelligent waiver of the right to silence." CT 178; RT 176-77. Because the evidence was not

5   permitted at trial, he lacks standing to challenge the interrogation.

6   In his traverse, Petitioner agrees with Respondent's argument and concedes this claim.

7   Therefore, it should be denied.

8   **RECOMMENDATION**

9   Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

10   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

11   Respondent.

12   This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

13   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

14   of the Local Rules of Practice for the United States District Court, Eastern District of California.

15   Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party

16   may file written objections with the court and serve a copy on all parties.  Such a document should

17   be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

18   objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)

19   after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

20   28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

21   time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

22   Cir. 1991).

23   IT IS SO ORDERED.

24   **Dated:   July 21, 2007**          **/s/ Dennis L. Beck**
                                          UNITED STATES MAGISTRATE JUDGE

25

26

27

28